FILED
2013 Mar-19  PM 02:48
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **SOUTH-CENTRAL CONFERENCE OF SEVENTH DAY ADVENTISTS, et al.,** | ] ] ] ] | |
| **Plaintiffs,** | ] | **2:12-cv-2451-KOB** |
| | ] | |
| **v.** | ] | |
| | ] | |
| **CITY OF ALABASTER,** | ] | |
| | ] | |
| **Defendant.** | | |

## <u>MEMORANDUM OPINION</u>

"Situations will arise where it will be difficult to determine whether a particular activity is religious or purely commercial. The distinction at times is vital." *Murdock v. Pennsylvania*, 319 U.S. 105, 110 (1943).  The distinction between religious and commercial speech has never been more central than in this case.

This matter comes before the court on the parties' cross motions for summary judgment. (Docs. 29 & 34). The individual Plaintiffs to this action are Seventh-Day Adventist "Literature Evangelists" who canvass door-to-door in the summer in various pre-determined locations, and Plaintiff South Central Conference of Seventh-Day Adventists ("SCCSDA") represents the interests of many Literature Evangelists who do the same across the country. The SCCSDA and the individual Plaintiffs brought this action to challenge Defendant City of Alabaster's Business License and Solicitation Permit Ordinances, which require the Literature Evangelists, among others, to obtain a license and permit before soliciting door-to-door in the City.

Both parties have filed motions for summary judgment claiming that no genuine issues of

material fact exist and that they are entitled to judgment as a matter of law.  The court finds that genuine issues of material fact do exist as to whether the Plaintiffs were engaging in commercial or religious speech, and those genuine issues preclude the court from granting summary judgment for either party. For the following reasons, the court will DENY summary judgment for both parties.

I.      STATEMENT OF FACTS

        A.      FACTUAL HISTORY

        Seventh-Day Adventist ("SDA") church members communicate their religious views through door-to-door witnessing, prayer and pastoral counseling, solicitation of contributions, and the sale and free distribution of literature about the SDA faith. The Plaintiffs concede for summary judgment purposes that the church members' evangelistic activities at issue in this lawsuit include the sale of books. (Doc. 30, at 8). The City of Alabaster ("the City") contends that the SDA canvassers at issue in this lawsuit were only selling books door-to-door and were not ministering or proselytizing to its citizens. The issue of what exactly the Literature Evangelists did when they approached homes in the City is hotly contested, and the evidence before the court does nothing to clarify the contradictory narratives of what the City's citizens observed when they answered the door for a Literature Evangelist.

        1.      June 27, 2012 Citation

        The Plaintiffs contend that they informed the City of the Literature Evangelists' intended canvassing during the summer of 2012 on at least two occasions:  by a letter from Java Mattison, a SCCSDA employee, to Alabaster Chief of Police Stanley Oliver (doc. 31-6, at 2) and by a letter from Mr. DeCanal to City Clerk Ms. Massey (doc. 31-20, at 34). The City never responded to

either of these letters, and the Literature Evangelists began going door-to-door in the summer of 2012 without obtaining a Business License or Solicitation Permit. The City disputes that either of these letters accurately described the Literature Evangelists' activities within the City. The letter from Ms. Mattison specifically said that the Plaintiffs would be engaging in "its annual door-to-door ministry" in Alabaster from May 20 through August 12, 2012 (doc. 31-4, at 1-2), but the letter did not mention the sale of books.

On the night of June 27, 2012, the Alabaster Police Department received multiple calls from citizens complaining of individuals going door-to-door selling books, often late into the evening. The City contends that many of these citizens, particularly the elderly, were worried and frightened by having individuals knock on their door late into the evening. At approximately 7:57 p.m. the Alabaster Police Department dispatched an officer to 1140 Tribe Trail in response to a citizen's complaint about an individual selling books door-to-door. When the Officer went to that address, he did not see anyone but he patrolled the area until he located an individual matching the description reported by the citizen.

Around 8:07 p.m., City of Alabaster Police Officer Steve Hataway stopped Stephen Douglas, one of the Literature Evangelists who was canvassing door-to-door, at 1032 Arrowhead Trail. The City contends that Mr. Douglas stated he worked for Family Education Services as part of a scholarship program, and the parties agree that at some point in the conversation Mr. Douglas told Officer Hataway that he was a spiritual evangelist. Police Officer Crocker joined Officer Hataway at the scene, and Mr. DeCanal, Mr. Douglas' team leader, was also called to the scene. Mr. DeCanal stated that he was with a church organization, did not need a permit, and operated on a donation basis. The Plaintiffs contend that Mr. DeCanal explained the evangelistic

3

purpose of his team's action to the Officer, but the City disputes that Mr. DeCanal offered any

explanation. The Officer criminally charged Mr. Douglas with "selling books door-to-door

without a City of Alabaster permit" in violation of Ordinance No. 78-33. (Doc. 31-9, at 2).  The

Officers told Mr. DeCanal that he could not sell books door-to-door without a permit and that if

he was found going door-to-door again without a business license or permit, he could go to jail.

The parties dispute whether the Officers told Mr. DeCanal that he could not minister or

proselytize door-to-door.

2.    Literature Evangelist Program

The Summer Student Missionary Program sponsored by SCCSDA and operated by

Family Health Education Services, an organization associated with SCCSDA, supports Literature

Evangelists, like the ones who went from door-to-door in Alabaster in the summer of 2012.  In

the Program, SDA church members, typically college students, travel in teams to various pre-

determined locations and go door-to-door. The Plaintiffs claim that the Literature Evangelists

canvass door-to-door distributing books about the SDA faith, engaging in verbal evangelism, and

soliciting donations to support the Program and further its evangelistic purpose.

The City, however, contends that the Literature Evangelists do not minister or proselytize

and instead exclusively sell books door-to-door for a pre-determined price and that the books are

also offered for sale on the Family Health Education Services website for a pre-determined price.

The City contends that many of the books focus on non-religious matters and that the Literature

Evangelists describe and try to sell the books to citizens in non-religious terms.

Marsha Massey, a citizen of the City and City Clerk of the City of Alabaster, stated in a

sworn affidavit that when the Literature Evangelists approached her door to sell books, "There

4

was no discussion about religion and there were no offers of free material or requests for

donations to any church or religious institution." (Doc. 39-1, at 5). Ms. Massey also testified

under oath at a hearing held by the court on July 18, 2012,[1] about her interactions with Plaintiff

Joshua Desire, the Literature Evangelist that approached her door and sold her four books:

> Q: When Mr. Desire came to your door, did you express any desire to talk
> about religion with him or ask him what church he was from or you might
> be interested in Bible stories or engage him in any conversation like that?
> Ms. Massey: No.
> Q: Did he offer any of that kind of conversation?
> Ms. Massey: No, sir. . .
>
> Q: As I understand it from your perspective, the young man was selling
> magazines [sic] for his college fund; is that right?
> Ms. Massey: Correct
> Q: And is that the reason, the only reason that you bought the books?
> Ms. Massey: Yes, sir.
> Q: No mention of any religious principles, precepts, thoughts or ideas,
> there  was no preaching to you or anything of that sort, was there?
> Ms. Massey:  No, sir, He did not minister to me, testify to me in any way
> . . .
>
> Q: So no question it was a commercial transaction?
> Ms. Massey: Not to me . . .
>
> Ms. Massey: So then I spoke with the young man and that was the only
> information that I received, was that he was selling the books in order to
> help pay for his –as a matter of fact, he said he was going to a private
> college and he was trying to save for college. So this was to help with his
> college fund . . .
>
> Q: Was there any mention at all about a church involvement or a religious,
> anything about religion at all?
> Ms. Massey: No, ma'am.

---

[1] As discussed later, the court held a hearing on the City's motion for a temporary
restraining order and a preliminary injunction, but the parties reached an agreement on the
motion for temporary restraining order, rendering the motion moot.

(Doc. 22, at 105, 110, 11, 112, and 113).

James Kelly, a citizen of the City, also stated in a sworn affidavit that the young female who approached his door to sell books did not "minister, proselytize, or speak to [him] about religion." (Doc. 39-2, at 1). The City contends that the Literature Evangelists represented to the citizens they were trying to sell books to raise money for their education. (Doc. 39-1, at 5).

At the hearing held before this court on July 18, 2012, Stephen Douglas, one of the Literature Evangelists who went door-to-door in the City in the summer of 2012, testified that he and the other students going door-to-door "weren't selling books" and were "evangelists." (Doc. 31-18, at 7, 24-25).  Although at the hearing, Mr. Douglas also responded "No" to the questions, "[W]ere there – other than the books, were there anything else that you offered for donations, sold, or any other way dealt with the occupants of the house that you were going door-to-door on?" and "[T]here were no records, there was no tape recordings, anything of that sort that you presented?"(Doc. 22, at 8, 10).  In an affidavit, Mr. Douglas also stated that in response to a police officer's questioning about what he was doing going door-to-door, he responded, "[W]e were distributing free religious literature and asking for and accepting donations to support the program." (Doc. 8, at 14).

Nathanael DeCanal, the Literature Evangelist team leader for the City of Alabaster, testified that his team does not "sell books." (Doc. 31-18, at 29).  At the hearing before this court he testified that, "The reason why our group is involved in what we're doing is to evangelize." (Doc. 22, at 34).  Joshua Desire, the Literature Evangelist who visited Ms. Massey, testified in a

deposition that he and the other Literature Evangelists were not selling books but were leaving them for donations with people and that when he approached people's doors, he didn't "want people to see [him] as a salesman. [He] want[ed] people to see [him] as a missionary." (Doc. 31-19, at 45-46, 67).

The Plaintiffs allege that the Literature Evangelists only distribute books with a religious message and content. (Excerpts at Docs. 32-3–32-13). Mr. Douglas testified in his deposition that the books he presented when he went door-to-door were religiously based, with names like "Real Heroes: Amazing Stories from the Bible" and  "The Prince of Peace: the Amazing Story of Jesus." (Doc. 31-18, at 20-21). In his deposition, Joshua Desire recited a typical speech he would make when going door-to-door, and the books he named and described were religiously based. (Doc. 38-19, at 76-81). The City disputes that all of the books at issue contain religious material and contend that, even if they do contain some religious content, the Literature Evangelists do not promote the books as religious when they go door-to-door.

The Plaintiffs concede that three of the books "designed for family use" encourage the reader and his or her family to follow aspects of the SDA Church's fundamental beliefs regarding Christian behavior with very few explicit evangelistic references. The Plaintiffs contend that these books are distributed as an alternative method of evangelism to people who may not be interested in explicit religious messages. (Excerpts at Docs. 32-15–32-16). While the City contends that according to the Plaintiffs' training materials, Literature Evangelists are trained to focus their efforts on promoting cookbooks and health, the evidence shows that the training materials simply provide the appropriate questions to attract a varied audience who may not

necessarily be  interested in the SDA's evangelistic literature. (Doc. 39-5).

The Plaintiffs claim that the Literature Evangelists' door-to-door evangelism is "an integral part of their following of Church doctrine and personal religious belief." (Doc. 30, at 11). The Plaintiffs also contend that monetary solicitations are integral to the religious message presented by the Literature Evangelists because "the simple act of making a donation or a purchase is often the first step toward religious conversion." *Id.* The City disputes that the Literature Evangelists' activities have any impact on their religion or larger church community because the Literature Evangelists simply sell books door-to-door and do not minister or proselytize about their faith.

### 3.    The City's Ordinances

The City requires both a Business License and a Solicitation Permit before the Plaintiffs may lawfully engage in what they characterize as "evangelistic activity" and what the City characterizes as selling books door-to-door. (Doc. 30, at 12).  On August 20, 2012, after this suit was filed, the City repealed the Solicitation Permit Ordinance that was in effect at the time Mr. Douglas was charged and has enacted a new Solicitation Permit Ordinance. The Business License Ordinance, however, has not changed.

### a.    The Business License Ordinance

The Business License Ordinance makes it unlawful for any person to engage in "[a]ny commercial or industrial activity or any enterprise, trade, profession, occupation, or livelihood . . . whether or not carried on for gain or profit, and whether or not engaged in as a principal or as an independent contractor, which is engaged in, or caused to be engaged in, within a

municipality" without first obtaining a Business License, providing the required information, and paying a fee. (City of Alabaster Ordinance No. 07-007, § 2[1]; Doc. 31-14, at 2).

The Business License application requires the disclosure of some personal information, and failure to provide the information allows the City to assess taxes based upon "the most accurate and complete information reasonably obtainable." (Ordinance No. 07-007, § 8; Doc. 31-14, at 7). In cases of non-payment of the licensing fee, the City may place a lien on all real and personal property of the business to account for the tax liability. (Ordinance No. 07-007, § 13; Doc. 31-14, at 10). Under the Ordinance, the City can also inspect a business' premises and records to determine the proper license classification and/or fee and/or tax. (Ordinance No. 07-007, § 9; Doc. 31-14, at 8).

 The City applies the Business License Ordinance to all sales, including those by charitable and non-profit organizations, within the City, except those exempted by state statute or ordinance. The City does not exempt the Plaintiffs from the Business License requirement, and the Plaintiffs' activities are subject to taxation and fees under Schedule A of the Business License Ordinance.

The Business License must be renewed annually and violations of the Ordinance are punishable with the imposition of a fine or imprisonment for willful violations. (Ordinance No. 07-007, § 6 Doc. 31-14, at 6). Violations of the Ordinance are commonly prosecuted by the City. The Plaintiffs contend that the City has "unfettered discretion to determine whether to grant or deny a Business License." (Doc. 30, at 15). The City disputes this characterization of its discretion and points to the procedures for denial of an application for a business license

contained in the Ordinance. (Ordinance No. 07-007, § 18; Doc. 31-14, at 11). The first available appeal of the denial of an application for a business license is to the "municipal governing body." *Id.*

> b.      The Amended Solicitation Permit Ordinance

The Amended Solicitation Permit Ordinance allows for two alternative permits: one for "for profit sales" and one for "charitable solicitations." (City of Alabaster Ordinance No. 12-008, § 8, 18; Doc. 39-8, at 6, 8). "For profit sales" are defined as "any Sale, as defined herein, offered or performed for the pecuniary benefit of any Person not affiliated with a Charitable Organization," and "Sale" is defined as "the exchange of goods or services for an amount of money or its equivalent." (City of Alabaster Ordinance No. 12-008, § 3; Doc. 39-8, at 3). The definition of "Charitable Organization" includes "a person or nonprofit corporation who is or holds himself or herself out to be established for a . . . religious purpose." (City of Alabaster Ordinance No. 12-008, § 3; Doc. 39-8, at 2).

"Charitable or Religious Purposes" are defined as "[a]ny charitable, benevolent, philanthropic, humane, patriotic, scientific, artistic, public health, social welfare, advocacy, environmental, conservation, civic, religious or other eleemosynary purpose. . . ." (City of Alabaster Ordinance No. 12-008, § 3; Doc. 39-8, at 2-3). Finally, "solicit or solicitation" is defined as:

> [T]he request directly or indirectly of money, credit, property, financial assistance
> or other things of value on the plea of representation that such money, credit,
> property, financial assistance or other things of value will be used for a charitable
> or religious purpose as those purposes are defined in this article. Those words
> shall also mean and include the following methods of securing money, credit,

10

property, financial assistance, or other thing of value on the plea or representation
that it will be used for a charitable or religious purpose as herein defined:

> (1) Any oral or written request; . . .

> (4) The sale of, offer or attempt to sell, any advertisement, advertising
> space, book, card, chance, coupon, device, magazine, membership,
> merchandise, subscription, ticket or other thing in connection with which
> any appeal is made for any charitable or religious purpose or where the
> name of any charitable or religious person is used or referred to in any
> such appeal as an inducement or reason for making any such sale, or when
> or where in connection with any such sale, any statement is made that the
> whole or any part of the proceeds from any such sale will go or be donated
> to any charitable or religious purpose.

(City of Alabaster Ordinance No. 12-008, § 3; Doc. 39-8, at 4).

The Ordinance carves out some specific exemptions for organizations that do not have to

obtain a charitable solicitation certificate:  "1) any established person organized and operated

exclusively for religious purposes and not operated for the pecuniary profit of any person, if the

solicitations by such person are conducted among the members thereof by other members or

officers thereof voluntarily, or if the solicitations are in the form of collections or contributions at

the regular assemblies of any such established person; . . . 6) religious persons advancing a

religious message, provided that such persons is not seeking, nor requesting donations,

contributions, or sales. . . ." (City of Alabaster Ordinance No. 12-008, § 18; Doc. 39-8, at 10).

The Plaintiffs contend that they do not satisfy any of these content-based exceptions whose

speech is not subject to the solicitation permit requirement.

The Plaintiffs contend that the City exercises discretion to determine which type of permit

applies, but the City argues that the definitions in the Ordinance preclude any discretion in

deciding which type of permit applies to a particular applicant. The Plaintiffs also argue that the City intends to enforce the Ordinance against its activities, but the City's representative stated that the City intended to enforce the Ordinance in the future, not that it specifically would or would not enforce the Ordinance against the Plaintiffs. The Plaintiffs contend that under the Ordinance, the City requires a permit before the Plaintiffs can engage in any protected religious speech anywhere within the City, but the City disputes this contention and argues that the Ordinance only requires a certificate  for door-to-door sales or solicitation as defined in the Ordinance. The Plaintiffs contend that under the Ordinance, the door-to-door distribution of free literature would require a charitable solicitation certificate, but the City argues that the Ordinance only requires a certificate to *solicit* contributions or donations or to make sales.

The Ordinance imposes substantial informational requirements upon applicants, who must fill out the application under oath. (City of Alabaster Ordinance No.  12-008, § 14; 18; Doc. 39-8, at 6, 8-9). For-profit sales certificate applicants  must provide twelve categories of information, and applicants for charitable solicitation certificates must provide seventeen categories of information. Both types of permits require the applicant to furnish "[s]uch other information as may be submitted to the revenue department in order to determine the kind and character of the proposed solicitation." *Id.* The Plaintiffs argue that this discretion retained by the City has been exercised in the past to require, among other things, descriptions of all vehicles used for solicitation in the Program. The Ordinance requires a $50 application fee for for-profit sales certificates, but "no cost" for charitable solicitation certificates. The certificate is valid for six months after its issuance date and can be renewed by filing a new application.

The Ordinance allows the City the discretion to determine whether the applicant seeking to obtain a certificate is actually engaged in a charitable purpose and to investigate "all books, records or other information reasonably necessary to enable the revenue department to fully and fairly inform the public of all facts necessary to a full understanding by the public of the work and methods of operation" of the solicitors and their sponsoring organization. (City of Alabaster Ordinance No.  12-008, § 19; Doc. 39-8, at 10). The City contends that the Ordinance defines "charitable" and "charitable organization" so any discretion retained by the City is simply to determine whether an applicant's activities fall within those definitions. The Plaintiffs  point to the testimony of Rebecca Byrd, a City employee, who stated that people reading the Ordinance are unable to determine what information actually needs to be included in an application and that the City sometimes imposes additional informational requirements upon applicants.  (Doc. 30-21, at 207-08; 267-68).

Under the Ordinance, the City must issue the applicant a certificate within ten days of application and any denial "shall be in writing, and shall set forth the reasons therefor." (City of Alabaster Ordinance No.  12-008, § 18; Doc. 39-8, at 9).  Any denial may be appealed to the City Council by written statement within ten days of the issuance of the denial. (City of Alabaster Ordinance No.  12-008, § 18; Doc. 39-8, at 10). The appeal will be heard at the regularly scheduled City Council meeting within twenty days of the notice of appeal, and a decision will be made at the City Council meeting. *Id.*  The Plaintiffs claim that the Ordinance provides no remedy if the permit is not issued but not denied outright either and that the Ordinance provides no guidance on the appeal. The Plaintiffs also contend that the Ordinance does not contain any

13

mechanism for judicial review of the denial of an application and, further, no time limits to assure *timely* judicial review of a denial. The City concedes that the Ordinance does not specifically provide a mechanism for judicial review but contends that the Ordinance does not prohibit or inhibit an applicant from seeking judicial review. The parties agree that the Ordinance does not permit the conduct to proceed in the absence of a judicial determination or pending a judicial proceeding.

The Plaintiffs claim that the City could not identify any relation between the information required by the applications and any legitimate government purpose, but the City cites the purposes as laid out in the Ordinance as its legitimate government purposes for enacting the Ordinance: "The entering into residential property by peddlers, canvassers, solicitors, and itinerant vendors of goods and services is a matter of public concern, necessitating the reasonable regulations of this chapter for such conduct for the preservation of the privacy and safety of the citizens of the city, alleviate public annoyance and alarm, and the detection and prevention of fraud . . . and charitable solicitations as fraud . . . ." (City of Alabaster Ordinance No. 12-008, § 2; Doc. 39-8, at 1).

The Plaintiffs claim that the Ordinance requires a bond to be posted before any certificate holder may engage in any solicitation or sales, but the City disputes this contention because the sections the Plaintiffs refer to only apply to a "peddler, hawker, itinerant vendor or solicitor . . . [engaged] in the business of selling tangible personal property at retail on a public street." (City of Alabaster Ordinance No. 12-008, § 16; Doc. 39-8, at 7). The definition of "itinerant or transient vendor or peddler" explicitly excludes "individuals going in or upon private property

14

for religious, charitable, governmental, educational, or political purposes," and thus this bond requirement does not apply to the Plaintiffs' activities. (City of Alabaster Ordinance No. 12-008, § 13; Doc. 39-8, at 15).

B.   PROCEDURAL HISTORY

On July 13, 2012, the Plaintiffs filed their Complaint against the City and filed a motion for a temporary restraining order and a preliminary injunction prohibiting the City from enforcing its Ordinance against the Plaintiffs. (Docs. 1 & 2). The court held a hearing on July 18, 2012, and the parties reached an agreement on the motion for a temporary restraining order, rendering the motion moot. (Doc. 13). The City agreed not to require a Business License or Solicitation Permit from the Plaintiffs until this court issued a ruling on the constitutionality of the Ordinances. *Id.*

On November 21, 2012, the Plaintiffs filed an Amended Complaint addressing the City's Amended Solicitation Ordinance. (Doc. 25). The Complaint seeks injunctive relief enjoining the City and its agents from enforcing the Ordinances against the Plaintiffs or other participants in the Summer Student Missionary Program and a declaratory judgment that the Ordinances are unconstitutional on their face and as applied. *Id.*  The City filed a motion to dismiss for lack of standing based on the Amended Complaint. (Doc. 27). On March 5, 2013,  court denied the motion to dismiss and ruled that the Plaintiffs do have standing to challenge the Amended Ordinance. (Doc. 52).  After engaging in expedited discovery, the parties filed cross-motions for summary judgment, and the court considers both motions now.

II.   STANDARD OF REVIEW

Summary judgment allows a trial court to decide cases when no genuine issues of

material fact are present and the moving party is entitled to judgment as a matter of law. *See*

Fed. R. Civ. P. 56. When a district court reviews a motion for summary judgment, it must

determine two things: (1) whether any genuine issues of material fact exist; and if not, (2)

whether the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56©.

The moving party "always bears the initial responsibility of informing the district court of

the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any,' which it believes

demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986) (quoting Fed. R. Civ. P. 56). The moving party can meet this burden by offering

evidence showing no dispute of material fact or by showing that the non-moving party's evidence

fails to prove an essential element of its case on which it bears the ultimate burden of proof.

*Celotex*, 477 U.S. at 322–23. Rule 56, however, does not require "that the moving party support

its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.*

Once the moving party meets its burden of showing the district court that no genuine

issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that

there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats &*

*Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Disagreement between the parties is not

significant unless the disagreement presents a "genuine issue of material fact." *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)   In responding to a motion for summary

judgment, the non-moving party "must do more than simply show that there is some

metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 586 (1986).  The non-moving party must "go beyond the pleadings and by [its]

own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,'

designate 'specific facts showing that there is a *genuine issue for trial*.'" *Celotex*, 477 U.S. at 324

(quoting Fed. R. Civ. P. 56(e)) (emphasis added); *see also* Advisory Committee Note to 1963

Amendment of Fed. R. Civ. P. 56(e) ("The very mission of summary judgment procedure is to

pierce the pleadings and to assess the proof in order to see whether there is a genuine need for

trial.").  The moving party need not present evidence in a form admissible at trial; "however, he

may not merely rest on [the] pleadings." *Celotex*, 477 U.S. at 324.  If the evidence is "merely

colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477

U.S. at 249–50 (citations omitted).

In reviewing the evidence submitted, the court must "view the evidence presented

through the prism of the substantive evidentiary burden," to determine whether the nonmoving

party presented sufficient evidence on which a jury could reasonably find for the nonmoving

party. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir.

1988).  The court must refrain from weighing the evidence and making credibility

determinations, because these decisions fall to the province of the jury.  *See Anderson*, 477 U.S.

at 255; *Stewart v. Booker T. Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000); *Graham v.*

*State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).  "Even if a district court

'believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant

summary judgment on the basis of credibility choices.'" *Feliciano v. City of Miami Beach*, ____

F.3d ____, 2013 WL 425445, at *16 (11th Cir. Feb. 5, 2013) (citing *Miller v. Harget*, 458 F.3d

1251, 1256 (11th Cir. 2006)).  The court should not disregard self-serving statements made in sworn testimony simply because they are self-serving at the summary judgment stage, and if the self-serving statements create a genuine issue of material fact, the court should deny summary judgment on that basis. *Id.* * 18.

Furthermore, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party.  *Graham*, 193 F.3d at 1282.  The nonmoving party "need not be given the benefit of every inference but only of every reasonable inference." *Id.*  The evidence of the non-moving party "is to be believed and all justifiable inferences are to be drawn in [its] favor."  *Anderson*, 477 U.S. at 255.  After both parties have addressed the motion for summary judgment, the court must grant the motion *only if* no genuine issues of material fact exist *and if* the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.

On cross-motions for summary judgment, "a court may discover questions of material fact even though both parties . . .  have asserted that no such questions exist." *Griffis v. Delta Family-Care Disability*, 723 F.2d 822, 824 (11th Cir. 1984) (citing *Donovan v. District Lodge No. 100, International Ass'n of Machinists*, 666 F.2d 883, 886-87 (5th Cir.1982); Wright and Miller, Federal Practice and Procedure: Civil, § 2720).  "[B]efore the court can consider the legal issues raised by the parties on cross-motions for summary judgment, it must have no doubt as to the relevant facts that are beyond dispute."*Griffis,* 723 F.2d at 824.

III.    LEGAL DISCUSSION

Although both parties raise other issues in their respective briefs, the validity of the

Ordinances depends on whether the City can constitutionally restrict the Plaintiffs' speech. The parties' other arguments about the constitutionality of the specific aspects of the Ordinances are irrelevant if the Ordinances are unconstitutional in their entirety. Therefore, the court first addresses the validity of the Ordinances under the First Amendment. To determine whether the Ordinances are valid restrictions on First Amendment speech, the court must first determine whether the speech at issue is commercial or non-commercial because "the Constitution accords less protection to commercial speech than to other constitutionally safeguarded forms of expression." *Bolger v. Youngs Drugs Prods. Corp*., 463 U.S. 60, 64-65 (1983).

In *Board of Trustees of State University of New York v. Fox*, the Supreme Court confronted the question of whether Tupperware parties held in University dorms were commercial speech. 492 U.S. 469 (1989). In determining whether the speech was commercial, the Court first asked whether the speech "'propose[d] a commercial transaction.'" *Id.* at 473 (quoting *Va. Pharm. Board v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976)). In determining that the Tupperware parties clearly met this test, the Court then asked whether the other aspects of the parties, such as lessons in financial responsibility and efficient ways to run a home, dictated that the commercial speech was inextricably intertwined with the pure speech so that the entire transaction needed to be classified as noncommercial. *Id.* at 474. The Court stated that "communications can 'constitute commercial speech notwithstanding the fact that they contain discussions of important public issues. . . .'" *Id.* at 475 (quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 67-68 (1983)). The Court ultimately determined that the home economics elements of the Tupperware parties "no more converted [the] presentations into

educational speech, than opening sales presentations with a prayer or a Pledge of Allegiance would convert them into religious or political speech." *Fox,* 492 U.S. at 474-75.

In *Bolger*, the Court considered whether informational pamphlets promoting prophylactics and the defendant's products in particular were commercial speech. *Bolger*, 463 U.S. at 62. The Court concluded that the presence of three factors provided strong support for the District Court's conclusion that the pamphlets were commercial speech: (1) the speech was a form of advertisement; (2) the speech referenced a specific product; and (3) the defendant had an economic motivation for distributing the pamphlets. *Id.* at 66-67. The court determined that the pamphlets were commercial speech "notwithstanding the fact that they contain[ed] discussion of important public issues." *Id.* at 67.

The Supreme Court has also faced the issue of determining what is commercial speech in the religious context. In *Murdock v. Pennsylvania*, the city of Jeanette, Pennsylvania, enacted an Ordinance requiring "all persons canvassing for or soliciting within said Borough, orders for goods, paintings, pictures, wares, or merchandise of any kind, or persons delivering such articles under orders so obtained or solicited, shall be required to procure from the burgess a license to transact said business and shall pay to the Treasurer of said Borough therefore the following sums  . . . ." *Murdock v. Pennsylvania*, 319 U.S. 105, 106 (1943).  The petitioners in that case were Jehovah's Witnesses who canvassed door-to-door "distributing literature, . . . soliciting people to purchase certain religious books and pamphlets," and playing a phonograph, which expounded their views on religion.  *Id.* at 106-107.  "It was [the Jehovah's Witnesses'] practice in making these solicitations to request a 'contribution' of twenty-five cents for each of the books

and five cents for each of the pamphlets but to accept lesser sums or even donate the volumes in case an interested person was without funds." *Id.* The petitioners did not obtain a license and were subsequently convicted and fined for a violation of the ordinance for selling books door-to-door. *Id.*

The Court noted that Jehovah's Witnesses "spread their interpretations of the Bible and their religious beliefs largely through the hand distribution of literature by full or part time workers" and that "hand distribution of religious tracts is an age-old form of missionary evangelism—as old as the history of printing presses." *Id.* at 108. The Court described the petitioners' activities as "more than preaching . . . more than distribution of religious literature. It is a *combination of both*. Its purpose is as evangelical as the revival meeting." *Id.* at 109 (emphasis added). The Court discussed what makes otherwise religious speech commercial in nature:

> [T]he state can prohibit the use of the street for the distribution of purely commercial leaflets, even though such leaflets may have a civil appeal, or a moral platitude appended. They may not prohibit the distribution of handbills in the pursuit of a *clearly religious activity* merely because the handbills invite the purchase of books for the improved understanding of the religion or because the handbills seek in a lawful fashion to promote the raising of funds for religious purposes. But the mere fact that the religious literature is 'sold' by itinerant preachers rather than 'donated' does not transform evangelism into a commercial enterprise.

*Id.* at 111. (internal quotations omitted) (emphasis added). The Court held that the petitioner's speech was not commercial and that the city's license tax was a "restriction of the free exercise of those freedoms which are protected by the First Amendment." *Id.* at 114.

Similarly, in *Follett v. Town of McCormick, S.C.*, the town enacted an ordinance that

required individuals to pay for a license to sell books within its town limits. 321 U.S. 573, 574 (1944). The appellant, an ordained Jehovah's Witness minister, went door-to-door "distributing certain books" and earned his livelihood from the money he received. The minister claimed that he merely offered the books for a donation along with his evangelizing, but evidence showed that he offered to sell and did sell the books door-to-door. *Id.* He did not obtain a license and was found guilty of violating the ordinance. The Court ruled that although the preacher in this instance was not itinerant, as in *Murdock*, the same holding applied. Because he was preaching door-to-door,  requiring the minister to obtain a license for his religious and non-commercial speech was unconstitutional. *Id.* at 577-78.

Most recently in *Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton*, the Court addressed whether "a municipal ordinance that requires one to obtain a permit prior to engaging in the door-to-door advocacy of a political cause and to display upon demand the permit, which contains one's name, violates the First Amendment protection accorded to anonymous pamphleteering or discourse." 536 U.S. 150, 160 (2002).  The petitioners in this case were Jehovah's Witnesses who "offer religious literature without cost to anyone interested in reading it [and] . . . do not solicit contributions or orders for the sale of merchandise or services, but . . . do accept donations." *Id.* at 153. The petitioners did not apply for a permit under the Village's ordinance requiring canvassers to obtain a permit before going on private residential property for the purpose of promoting any cause. *Id.* at 154.

The Court noted its fifty-year history of invalidating restrictions on door-to-door canvassing and pamphleteering, cases mainly involving Jehovah's Witnesses because door-to-

door canvassing is mandated by their religion. *Id.* at 161. The ordinance at issue in that case was broadly applied to all canvassers from Camp Fire Girls and Jehovah's Witnesses to political candidates and trick-or-treaters. *Id.* at 165. The Court stated that "Had [the ordinance] been construed to apply only to commercial activities and the solicitation of funds, arguably the ordinance would have been tailored to the Village's interest in protecting the privacy of its residents and preventing fraud." *Id.* at 165. Thus, the issue was whether the ordinance was aimed at all speech or commercial speech. The Court determined that the ordinance, as broadly construed to apply to all speech, was unconstitutional. *Id.* at 169.

In this case, the facts before the court do not place this controversy squarely in line with any of the above Supreme Court cases. The evidence and the parties' characterization of the evidence create very contrasting pictures of what exactly happened when the Plaintiffs canvassed door-to-door in the City during the summer of 2012. Because the court cannot make credibility determinations, even when exclusively self-serving evidence is at issue, the court finds it impossible to determine whether the speech at issue rose to the higher level of protection afforded non-commercial, or religious speech.

In all of the Supreme Court cases cited above, the religious organizations canvassing door-to-door were indisputably engaged in some type of religious speech by ministering or proselyting. In *Murdock,* the canvassers played a phonograph with a religious message and in *Follett*, the ordained minister who went door-to-door sold literature but also preached. Here, no conclusive evidence exists that the Literature Evangelists preached or evangelized or made any mention of religion when they went door-to-door; nor does any conclusive evidence exist that

they absolutely never evangelized or proselytized when going door-to-door. The parties do not dispute that the Literature Evangelists sold books, but what the court cannot determine is whether that commercial activity was intertwined with religious speech as in *Murdock.* Without knowing whether any evangelizing or religious speech actually took place, the court cannot determine whether the speech was religious or commercial and thus cannot determine the validity of the Ordinances regulating that speech.

The cross-motions for summary judgment create an interesting procedural puzzle in this case. If the court takes the facts in the light most favorable to the Plaintiffs on the City's motion for summary judgment by assuming that the Literature Evangelists were evangelizing *and* selling books, then the court cannot grant summary judgment for the City because the Plaintiffs' speech would be religious in nature, and the Ordinances would be invalid as restricting First Amendment protected speech invalid under *Murdock* and *Follett*.

However, if the court takes the facts in the light most favorable to the City on the Plaintiffs' motion for summary judgment by assuming that the Literature Evangelists were exclusively selling books and not evangelizing in any way, then the court cannot grant summary judgment for the Plaintiffs because the Plaintiffs' speech would be commercial in nature, and the City could presumably regulate it under the *Fox* analysis. As the Supreme Court implied in *Village of Stratton*, if a municipality enacts an ordinance that regulates only commercial activities, then it is arguably narrowly tailored to its interest in protecting its citizens from fraudulent door-to-door sales. *Village of Stratton*, 536 U.S. at 165. The court will engage in a brief and cursory analysis of the City's Ordinances as valid regulations of commercial speech for

the purpose of illustrating why the court cannot grant summary judgment for the Plaintiffs.

Once the court determines that the speech at issue is commercial in nature, then the ordinance regulating the speech is subject to a less stringent standard than if the speech at issue were religious or otherwise not commercial. The Supreme Court described the standard used to determine whether an ordinance regulating commercial speech is constitutional:

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Fox*, 492 U.S. at 475 (quoting *Central Hudson Gas & Electric Corp. v. Pub. Service Comm'n of New York,* 447 U.S. 557, 566 (1980)).  In this case, the Plaintiffs' speech proposes a lawful transaction—selling books—and is not misleading, and thus is entitled to First Amendment protection.

Next, the court must determine whether the City has a substantial interest in regulating door-to-door sales and solicitations within its city limits.  The City explicitly lists its justifications for the Ordinance in the Ordinance itself: "The entering into residential property by peddlers, canvassers, solicitors, and itinerant vendors of goods and services is a matter of public concern, necessitating the reasonable regulations of this chapter for such conduct for the preservation of the privacy and safety of the citizens of the city, alleviate public annoyance and alarm, and the detection and prevention of fraud . . . and charitable solicitations as fraud . . . ." (Doc. 39-8, at 1).  In *Church of Scientology Flag Service Org., Inc. v. City of Clearwater*, the

Eleventh Circuit stated that the municipality had a *compelling* interest in "'protecting its citizens from abusive practices in the solicitation of funds for charity.'" 2 F.3d 1514, 1544 (1993) (quoting *Larson v. Valente*, 456 U.S. 228, 247 (1982)).  If the Eleventh Circuit held that the state's interest was compelling in that case, certainly the same interest qualifies as substantial in the case at hand.

Finally, the court must determine whether the government's regulation on commercial speech is "no more broad or no more expansive than 'necessary' to serve its substantial interest." *Fox*, 492 U.S. at 476 (quoting *Central Hudson*, 447 U.S. at 566)).  The Court elaborated on this standard by saying

> In sum, while we have insisted that the free flow of commercial information is valuable enough to justify imposing on would-be regulators the costs of distinguishing . . . the harmless from the harmful, we have not gone so far as to impose upon them the burden of demonstrating that the distinguishment is 100% complete, or that the manner of restriction is absolutely the least severe that will achieve the desired end. What our decisions require is a fit between the legislature's ends and the means chosen to accomplish those ends—a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served; that employs not necessarily the least restrictive means but, as we have put it in the other contexts discussed above, <u>a means narrowly tailored to achieve the desired objective</u>. Within those bounds we leave it to governmental decisionmakers to judge what manner of regulation may best be employed.

*Fox*, 492 U.S. at 480 (internal quotations and citations omitted) (emphasis added).

 Under this approach, the City's Amended Ordinance should be upheld as narrowly tailored to achieve the objectives it specifically lays out in the Ordinance itself. The City attempts to reasonably regulate the door-to-door solicitation of its citizens and tax the door-to-door commercial enterprises who benefit from the business of its citizens, while exempting purely

religious speech made by individuals or groups who are not seeking to solicit donations.

If the court took the facts in the light most favorable to the City and considered the Literature Evangelists' speech commercial for purposes of the Plaintiffs' motion for summary judgment, the court cannot grant summary judgment for the Plaintiffs because the Ordinance is valid as a reasonable regulation of commercial speech. Because even when taking the facts in the light most favorable to the non-moving party, neither motion for summary judgment can be granted as a matter of law, the court cannot grant either parties' motion.

IV.     CONCLUSION

All one must do is read the Literature Evangelists' and City citizens' divergent explanations of what occurred when the citizens purchased books from the Literature Evangelists to realize that the two distinct narratives that emerge cannot be reconciled.  Because the court cannot resolve these differing accounts of the Plaintiffs' activities without making some credibility and factual determinations, the court must deny summary judgment for both parties. Because genuine issues of *material* fact exist as to whether the Plaintiffs were engaging in commercial or religious/ non-commercial speech, the court must DENY the parties' motions for summary judgment and  will simultaneously enter an order to that effect.

DONE and ORDERED this 19th day of March, 2013.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE